# EXHIBIT "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
IN RE:                        ) Chapter 11
ETOYS, INC., et al.,          )
                              )
            Debtors.          ) Case No. 01-706 (MFW)
                              ) through Case No. 01-709 (MFW)
                              ) Jointly Administered
                              )
```

## OPINION[1]

Before the Court are Motions filed by a shareholder, Robert Alber ("Alber"), and an administrative claimant, Collateral Logistics, Inc. ("CLI"), against Barry Gold ("Gold"), Morris Nichols, Arsht & Tunnell ("MNAT") and Traub, Bonaquist, Fox LLP ("TBF") and certain of their partners (collectively "the Respondents") seeking removal, disgorgement of fees, and sanctions for contravening the disclosure requirements of Bankruptcy Rule 2014 and the conflict of interest prohibitions of section 327(a) of the Bankruptcy Code. The Movants also ask the Court to refer the matter for criminal and disciplinary investigations. The Respondents oppose the Motions. The United States Trustee (the "UST") initially filed a Motion seeking disgorgement of fees from TBF but now seeks approval of a settlement of that Motion. A Motion seeking approval of a

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

settlement with Goldman Sachs & Co. ("Goldman") is also pending. For the reasons set forth below, the Court will strike the CLI Motion, grant the Alber Motion as to MNAT in part, and approve the TBF and Goldman settlements.  The Court will deny Alber's Motion as to Gold, but articulates herein a new requirement that officers of a debtor must in the future disclose any connections they have with other parties in the case which create a potential or actual conflict of interest.

I.   BACKGROUND

On March 7, 2001 ("the Petition Date"), eToys, Inc., and certain of its affiliates (collectively "the Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors were electronic retailers of toys and other children's products.

On April 5, 2001, the Debtors filed applications to retain two firms as their bankruptcy attorneys: Irell & Manella ("Irell") and MNAT.  The UST objected to Irell's retention arguing that Irell was not disinterested under section 327(a) because Peter Juzwiak, the Debtors' Vice President and General Counsel, was to join the firm as a partner effective April 30, 2001.  As a result, Irell was retained as special counsel only.

In connection with the MNAT retention application, partner Robert Dehney ("Dehney") submitted an affidavit listing parties in interest in the case that the firm had represented within the previous three years or was representing at the time. (None of the other representations were on matters related to the Debtors.) The Dehney Affidavit failed to disclose that, at that time, MNAT was representing General Electric Capital Corporation ("GECC") and two affiliates of Goldman ("the Goldman Affiliates") in the bankruptcy case filed by Finova Capital Corporation ("Finova") on same day that the Debtors filed their case. No objections were filed to the MNAT application and, as a result, the Court approved MNAT's retention on April 25, 2001.

On March 16, 2001, the UST appointed the Official Committee of Unsecured Creditors ("the Committee"). The Committee retained TBF as its counsel, which was approved by the Court on April 25, 2001. On May 21, 2001, the Debtors hired Gold to coordinate their liquidation. On July 23, 2001, after the Debtors had obtained D&O insurance, Gold was named President and CEO. At no time did Gold or TBF disclose that Gold and TBF's senior partner, Paul Traub, were partners in an entity known as Asset Disposition Advisors, LLC ("ADA") or that, TBF paid Gold $30,000 a month from February to May 2001 for his services to ADA.

3

On November 1, 2002, the Court confirmed the Debtors' First
Amended Consolidated Liquidating Plan of Reorganization ("the
Plan"), which went effective on November 5, 2002.  Pursuant to
the Plan, the Debtors' remaining assets were vested in EBCI, Inc.
(the "Reorganized Debtor"), which was to be managed by a Plan
Administrator.  Gold was appointed as the Plan Administrator and
retained MNAT as counsel for the Reorganized Debtor.  The
Committee was dissolved and succeeded by the Post Effective Date
Committee (the "PEDC").  The liquidation of the Reorganized
Debtors' assets is close to conclusion.  The secured and priority
creditors have largely been paid in full and unsecured creditors
are expected to receive a distribution of approximately 16%.
Shareholders will receive no distribution.

On November 24, 2004, the PEDC filed a Motion for approval
of a settlement it had reached with Goldman for the return of
$200,000 of a success fee which had been paid pre-petition by the
Debtors.  Alber and CLI filed objections to that Motion asserting
that the attorneys and members of the PEDC had conflicts of
interest.

On December 20, 2004, Alber filed an emergency Motion for
sanctions and related relief against Gold, TBF and certain of its
partners.  On December 22, 2004, CLI filed a similar Motion.  On
January 25, 2005, Alber filed a Motion against MNAT purportedly

4

on behalf of himself and other shareholders which also seeks disqualification and disgorgement of fees.  Objections were filed by the Respondents.

On February 15, 2005, the UST filed its own Motion which sought disgorgement of fees from TBF (the "Disgorgement Motion"). The Disgorgement Motion was subsequently settled and a Motion to approve the settlement was filed on February 24, 2005 (the "Settlement Motion").  Alber and CLI filed pleadings in support of the Disgorgement Motion and in opposition to the Settlement Motion.

A hearing on all the Motions was held on March 1, 2005, at which evidence and testimony were presented in support of the parties' positions.  At the conclusion, the Court permitted additional briefing by the parties to explain their positions based on the facts that had been presented.[2]  That briefing is complete and the issues are now ripe for decision.

II.  JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 &

---

[2]  The Court directed the parties to complete briefing by March 15, 2005.  Despite that direction, Alber and Mr. Haas, purportedly on behalf of CLI, have continued to file pleadings related to the issues at bar.  The Court has stricken those pleadings.  Further, the pleadings filed by Mr. Haas on behalf of CLI have been stricken because a corporation must have counsel represent it in federal court.  See Discussion infra at Part A1.

157(b)(2)(A), (B) & (O).


III. <u>DISCUSSION</u>

Alber alleges that the Respondents violated Bankruptcy Rule
2014 and section 327(a) of the Bankruptcy Code by not disclosing
connections to other parties in the case, some of which he
asserts are actual conflicts of interest.  Alber contends that
the delayed disclosure was intentional and that even the
subsequent disclosure of the relationships failed to comply with
the requirements of the Rule.  Finally, Alber suggests that the
Respondents violated Bankruptcy Rule 2016, Rule 11 and various
provisions of title 18.  Alber asks the Court to: (1) compel the
Respondents to disgorge all payments that they have received to
date in the case; (2) dismiss MNAT and TBF as counsel to the
Reorganized Debtor and the PEDC, respectively; (3) permit Alber
to conduct far-ranging discovery of the Reorganized Debtor and
counsels' records; (4) appoint a trustee; and (5) refer the
entire matter for additional criminal and disciplinary
investigations into the conduct of the case.

A.    <u>Preliminary Arguments</u>

The Respondents raise preliminary arguments that the Court
is precluded from even addressing the merits of the Motions.

1.    <u>CLI Motion</u>

At the hearing it was asserted that the Motion filed by CLI
was procedurally improper because it was filed by a corporation
without benefit of an attorney.  The Court agreed and ruled that
CLI, as a corporation, may not file pleadings or appear except
through counsel.  Rowland v. California Men's Colony, 506 U.S.
194, 202 (1993) ("It has been the law for the better part of two
centuries . . . that a corporation may appear in the federal
courts only through licensed counsel.").  Therefore, the
pleadings filed by CLI have not been considered.[3]

### 2.    Jurisdiction over the PEDC and Reorganized Debtors

The Respondents also assert that the Court lacks
jurisdiction over the PEDC, the Reorganized Debtor, and the Plan
Administrator.  Section 5.3(c)(v) of the Plan empowers the Plan
Administrator to select, retain and compensate professionals
without approval of the Court.  Therefore, the Respondents assert
that the Court does not have the power to remove TBF and MNAT
from their post-confirmation employment as requested by Alber.

The Plan does, however, expressly provide that the Court
retains jurisdiction to remove the Plan Administrator for cause.
(See Plan at § 5.2.)  See also Griffin Resorts, Inc. v. Price
Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 161

---

[3]  This has not, however, diminished the issues addressed by the
Court because Alber's pleadings are substantially identical to
CLI's pleadings.

(3d Cir. 2004) (holding that "Retention of jurisdiction
provisions will be given effect, assuming there is bankruptcy
court jurisdiction.")

Notwithstanding that retention language, however, the post-
confirmation jurisdiction of the Bankruptcy Court is extremely
limited.  See, e.g., Resorts Int'l, 372 F.3d at 161 (concluding
that, notwithstanding retention of jurisdiction provisions in a
plan, "neither the bankruptcy court nor the parties can write
their own jurisdictional ticket.  Subject matter jurisdiction
'cannot be conferred by consent' of the parties. . . .  Where a
court lacks subject matter jurisdiction over a dispute, the
parties cannot create it by agreement even in a plan of
reorganization.") (citations omitted); Walnut Assocs. v. Saidel,
164 B.R. 487, 491-92 (E.D. Pa. 1994) ("Although the jurisdiction
of the bankruptcy court continues until the Chapter 11 case is
closed, once a plan has been confirmed, the court's jurisdiction
begins to weaken.") (citations omitted).

The Bankruptcy Court, however, does retain jurisdiction
post-confirmation to enforce the Plan.  11 U.S.C. § 1142(b)
("[t]he court may direct the debtor and any other necessary party
. . . to perform any . . . act . . . that is necessary for the
consummation of the plan.").  See, e.g., In re Terracor, 86 B.R.
671, 676 (Bankr. D. Utah 1988) ("The clear intent of section

8

1142(b) is for the court to retain its jurisdiction to assure
that the terms and provisions of the confirmed Chapter 11 plan
are carried out until the plan is completed and a final decree is
entered closing the case.").

     The Court concludes, nonetheless, that the issue of
replacement of professionals for the PEDC and the Reorganized
Debtors or the Plan Administrator does not fall within that
limited jurisdiction.  The identity of the Plan Administrator or
its professionals does not have such a significant impact on the
estate for the Court to conclude that it is related to the
bankruptcy case.  This case is factually indistinguishable from
the Resorts Int'l case where the Third Circuit held that the
bankruptcy court did not have jurisdiction over a suit by the
post-confirmation trust against a trust professional for post-
confirmation activities, notwithstanding the retention of
jurisdiction language in the plan and confirmation order.  372
F.3d at 161.  Therefore, the Court will deny Alber's request to
replace Gold, MNAT and TBF in their post-confirmation roles.  The
Court does, however, have jurisdiction to deal with the issues
raised by the parties' pre-confirmation actions.

               3.   Appointment of Trustee or Examiner

     The Respondents further argue that Alber's request for the
appointment of a trustee or examiner must be denied.  Section

9

1104 of the Bankruptcy Code, which provides the authority for

such an appointment, states:

> (a)  At any time after commencement of the case but
> <u>before confirmation of a plan</u>, on request of a party in
> interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of
> a trustee –
>> (1) for cause . . .; or
>> (2) if such appointment is in the interests
>> of creditors, any equity security holders,
>> and other interests of the estate. . . .
> (c) If the court does not order the appointment of a
> trustee under this section, then at any time <u>before the
> confirmation of a plan</u>, on request of a party in
> interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of
> an examiner. . . if –
>> (1) such appointment is in the interests of
>> creditors, any equity security holders, and
>> other interests of the estate; or
>> (2) the debtor's fixed, liquidated, unsecured
>> debts, other than debts for goods, services,
>> or taxes, or owing to an insider, exceed
>> $5,000,000.

11 U.S.C. § 1104 (emphasis added).  Because the Debtors' Plan has

been confirmed, the Respondents assert that Alber's request for

appointment of a trustee or examiner must be denied.  The Court

agrees that such a remedy is unavailable based on the express

language of the Code.

## 4.  Appointment of Equity Committee and Counsel

Alber also seeks the appointment of an equity committee and

counsel to permit him to continue to investigate this case.  The

Court concludes that such a request is not warranted.  Though

section 1102(a)(2) authorizes the Court to order the appointment
of additional committees of creditors or equity security holders,
it may do so only "if necessary to assure adequate
representation" of those parties.  In this case there is no
necessity to appoint a committee for equity security holders
because their interests have been extinguished by the Debtors'
Plan and they will receive nothing from the estate.  (See Plan at
§§ 4.10.2 & 7.1(b).)  See, e.g., In re Kalvar Microfilm, Inc.,
195 B.R. 599, 601 (Bankr. D. Del. 1996) (denying appointment of
equity committee where request was made after plan and disclosure
statement were filed).  Therefore, the Court will deny the
request for appointment of an equity committee and counsel
because it will provide no benefit to the estate and is simply
too late.

   5. Bad Faith

  The Respondents assert that the Motions were filed in bad
faith.  Specifically, Gold asserts that the CLI Motion was filed
in response to the Plan Administrator's objection to CLI's claim.
Gold argues that CLI's Motion was filed to gain leverage in that
contested matter.

  MNAT argues that Alber's request for relief is "a strategic
ploy" to improve his position under the established liquidation
scheme.  MNAT states that Alber has made it clear that he would

11

like the Debtors' shareholders to gain control of the Reorganized
Debtor.  MNAT notes further that Alber faxed the Motion to the
firm within hours after he was served with the Reorganized
Debtor's objection to Alber's Motions to disqualify TBF and Gold.

Even if the Motions were filed in bad faith, however, they
raise serious questions about the disclosure of conflicts and
connections made by both counsel for the Debtors and for the
Committee in this chapter 11 case.  Disclosure "goes to the heart
of the integrity of the bankruptcy system."  In re B.E.S.
Concrete Prods., Inc., 93 B.R. 228, 236 (Bankr. E.D. Ca. 1988).
Therefore, the Court is compelled to address the merits of the
Motions.

<h3>6.  Exculpations</h3>

The Respondents assert that the allegations regarding their
activities prior to confirmation of the Debtors' Plan are barred
by the exculpations they received under the Plan.  The Plan
provided releases to Gold, MNAT and TBF for "any act taken or
omission occurring on or after the Petition Date in connection
with or related to the Debtors, the Plan Administrator or the
Chapter 11 Cases . . . except for acts constituting willful
misconduct or gross negligence."  (See Plan at § 7.2(e).)  This
provision is consistent with Third Circuit authority.  See, e.g.,
In re United Artists Theatre Co., 315 F.3d 217, 230 (3d Cir.

2003) (holding that indemnification provision in retention
application of professional which excludes gross negligence and
willful misconduct is consistent with professional's fiduciary
duty to the estate under the Bankruptcy Code and Delaware law);
In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000)
(holding that release in plan of committee's professionals from
liability for acts other than gross negligence or willful
misconduct is consistent with the Bankruptcy Code).

    The allegations in Alber's Motions are, however, that the
parties had actual conflicts of interest which they knowingly
failed to disclose at the time of their retention and throughout
the case.  If this is true, the Court concludes that the
exculpation clause would not protect the Respondents because it
constitutes willful misconduct.  Therefore, the Court concludes
that the releases do not preclude Alber from pressing his
Motions.

### 7.  Timeliness of Motions

    MNAT asserts that, even absent a finding that Alber has
brought the Motions in bad faith, Alber's right to obtain relief
is time-barred under Rule 60(b).  Rule 60(b) allows the Court to
revoke or modify earlier orders and provides, in relevant part:

> On motion and upon such terms as are just, the court
> may relieve a party . . . from a final judgement . . .
> [or] order. . . for the following reasons: (1) mistake,

13

inadvertence, surprise or excusable neglect; (2) newly
discovered evidence which by due diligence could not
have been discovered in time to move for a new trial
under Rule 59(b); (3) fraud . . . misrepresentation, or
other misconduct of an adverse party . . . or (6) any
other reason justifying relief from the operation of
the judgment.  The motion shall be made within a
reasonable time, and for reasons (1), (2), and (3) not
more than one year after the judgment . . . [or] order
. . . was entered or taken.

Fed. R. Civ. P. 60(b).

   MNAT claims that sections (1), (2) or (3) are the only
conceivable bases under which Alber could seek relief, which
limits the time for bringing the motion to one year.  MNAT notes
that the Orders from which the Motions seek relief were all
entered more than one year ago.  Therefore, MNAT asserts that
relief is simply not available to Alber under Rule 60(b).

   While MNAT is correct that Alber could have been entitled to
relief from the Orders under sections (1), (2) and (3) of Rule
60(b), Rule 60(b)(6) allows a court to reconsider an order for
"any other reason justifying relief from the operation of the
[order]."  Fed. R. Civ. P. 60(b)(6).  "To justify relief under
subsection (6), a party must either show some 'other reason'
justifying relief outside of the earlier clauses of the Rule, or,
if the reasons for seeking relief could have been considered in
an earlier motion under another subsection of the rule, [he] must
show 'extraordinary circumstances' suggesting the party is

14

faultless in the delay." In re Benjamin's-Arnolds, Inc., No. 4-
90-6127, 1997 WL 86463, at *10 (Bankr. D. Minn. Feb 28, 1997).

Such "extraordinary circumstances" are present in this case.
If the professionals did not disclose their conflicts or other
connections with others in the case to the Court, or did so in
ways that clearly contravened the statutory requirements, then
parties did not have sufficient notice to seek relief under Rule
60(b)(1), (2) or (3) within the prescribed one-year time limit.
In fact, many of the relationships were revealed only in response
to Alber's Motion.

Furthermore, the disclosure obligation mandated by the
Bankruptcy Code and Rules "implicates a public policy interest
justifying relief . . . under Rule 60(b)(6)." In re Southmark
Corp., 181 B.R. 291, 295 (Bankr. N.D. Tex. 1995) (granting relief
under Rule 60(b)(6) from final fee order which had been entered
nearly three years earlier). See also Hazel-Atlas Glass Co. v.
Hartford Empire Co., 322 U.S. 238, 244-45 (1944) (holding that
fraud upon the court equitably tolls the time for seeking to set
aside a judgment or order); Pearson v. First NH Mort. Corp., 200
F.3d 30, 35-41 (1st Cir. 1999) (holding that attorney's false
disclosure which denied any connection with creditors could
support a finding that attorney had committed a fraud on the
court); Benjamin's-Arnold, 1997 WL 86463, at *10 (holding that

15

"the failure of an attorney employed by the estate to disclose a disqualifying conflict of interest, whether intentional or not, constitutes sufficient 'extraordinary circumstances' to justify relief under Rule 60(b)(6).  To hold otherwise would only serve to penalize the [Plaintiff] for delay that was beyond his control and to reward conflicted attorneys for failing to disclose their conflicts beyond the one-year period.").

In this case it is alleged that the professionals did not disclose conflicts of interest that would have barred their retention.  If this is true, it would constitute a fraud on the Court warranting relief even though more than a year has passed since the professionals were retained and their fees approved.  Therefore, the Court concludes that Rule 60(b)(6) allows the Court to consider Alber's Motions.

B.    MNAT and its Partners

Alber seeks an order disqualifying MNAT from serving as counsel to the Debtors and disgorgement of all fees earned by MNAT and its partners who worked on the case.  The basis of his Motion is that MNAT failed to disclose in its retention application that it had a conflict of interest because it was concurrently representing the Goldman Affiliates and GECC in the Finova case.  GECC was a creditor in this case and the Debtors had claims against Goldman (including litigation that is

16

currently being prosecuted by the PEDC).

MNAT opposes the Motion arguing that: (1) it made "timely, adequate and candid" disclosures of its connections to the Goldman Affiliates in full compliance with the requirements of Bankruptcy Rule 2014; (2) the late supplemental disclosure of its connection to GECC was the result of "an inadvertent oversight"; and (3) its representation of the Debtors in the case was consistent with section 327(a) of the Code.

### 1.   Disinterestedness and Adverse Interests

Section 327(a) of the Bankruptcy Code governs a debtor's employment of attorneys in a bankruptcy case.  It provides, in relevant part:

> The [debtor], with the court's approval, may employ one
> or more attorneys . . . that do not hold or represent
> an interest adverse to the estate, and that are
> disinterested persons, to represent or assist the
> [debtor] in carrying out [its] duties under this title.

11 U.S.C. § 327(a).

Thus, counsel for a debtor must not hold or represent an interest adverse to the estate.  An adverse interest is generally defined to mean "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant."  TWI Int'l v. Vanguard Oil Serv. Co., 162 B.R. 672, 675 (S.D.N.Y. 1987).  See also, In re National Liquidators, Inc.,

17

182 B.R. 186, 192 (S.D. Ohio 1995).

Further, under section 327 of the Code, counsel for the debtor must also be "disinterested."  Disinterestedness is defined to mean that counsel "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason."  11 U.S.C. § 101(14)(E).  See also, TWI Int'l, 162 B.R. at 675.

### 2.  Disclosure Requirements

Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case.  Rule 2014 requires that an application to retain counsel for the debtor:

> be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other parties in interest, [and] their respective attorneys and accountants.

Fed. R. Bankr. P. 2014(a).

Disclosure "goes to the heart of the integrity of the bankruptcy system."  B.E.S. Concrete, 93 B.R. at 236.  Therefore, the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an

18

attorney seeking employment is indispensable to the court's
discharge of its duty to assure the attorney's eligibility for
employment under section 327(a) and to make an informed decision
on whether the engagement is in the best interest of the estate.
See, e.g., In re Leslie Fay Cos., 175 B.R. 525, 533 (Bankr.
S.D.N.Y. 1994).  See generally 9 Collier on Bankruptcy ¶ 2014.03
(15th ed. 2004).  The bankruptcy court must be given timely and
complete disclosure by the debtor's attorney of all connections
with parties in interest in the case to "exercise its own ongoing
affirmative responsibility 'to root out impermissible conflicts
of interest' under Bankruptcy Code §§ 327(a) and 328(c)."  Rome
v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994).  See also, In re
BH & P, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991).

     Consequently, Bankruptcy Rule 2014 requires that the
attorney seeking employment disclose to the Court all connections
with parties in interest in the case, rather than furnishing only
those which appear to implicate "disinterestedness" or "adverse
interest" concerns under section 327(a).  See, e.g., In re
Filene's Basement, Inc., 239 B.R. 850, 856 (Bankr. D. Mass. 1999)
(holding that the requirements of Bankruptcy Rule 2014 "transcend
those of § 327(a), as they mandate disclosure of all connections
with the [applicant] rather than being limited to those which
deal with disinterestedness.").

19

Furthermore, the duty to disclose is ongoing.  Local Rule
2014-1 provides: "Promptly after learning any additional material
information relating to [its] employment (such as potential or
actual conflicts of interest), the professional employed or to be
employed shall file and serve a supplemental affidavit setting
forth the additional information."  Del. R. Bankr. P. 2014-1.
See also, Rome, 19 F.3d at 57-58 ("[A]s the bankruptcy court is
invested with ample power to deter inappropriate influences upon
the undivided loyalty of court-appointed professionals throughout
their tenure, the need for professional self-scrutiny and
avoidance of conflicts of interest does not end upon
appointment.") (emphasis in original); In re Tinley Plaza
Assocs., L.P., 142 B.R. 272, 278 (Bankr. N.D. Ill. 1992) ("[T]he
duty to disclose continues beyond the initial stage of
application to employ counsel. . . .  If a conflict arises after
attorneys are employed by the debtor-in-possession, such conflict
must be disclosed to the court and the court must immediately
disqualify the attorney.") (citations omitted).

"So important is the duty of disclosure that the failure to
disclose relevant connections is an independent basis for the
disallowance of fees." Leslie Fay, 175 B.R. at 533.  See also,
Rome, 19 F.3d at 59 ("Absent the spontaneous, timely and complete
disclosure required by section 327(a) and Fed. R. Bankr. P.

20

2014(a), court-appointed counsel proceed <u>at</u> <u>their</u> <u>own</u> <u>risk</u>.")
(emphasis in original).

        a.   <u>Goldman and its Affiliates</u>

MNAT argues that it was not aware of Goldman's involvement
in this case at the time it filed its retention application
because Goldman was not a creditor.  In addition, because MNAT
had not represented the Debtors before the case was filed (and
was originally only to serve as local counsel), it was not aware
of the Debtors' pre-petition transactions with Goldman which led
to the conflict.

Prior to the bankruptcy filings, the Debtors had engaged
Goldman to obtain a sale, merger or capital infusion for their
ailing businesses.  Pursuant to an engagement letter, the Debtors
advanced Goldman $150,000 for out-of-pocket expenses and a $3
million success fee.  That letter provided, however, that $2.5
million of the success fee was refundable if Goldman did not
facilitate the sale of the Debtors' assets for at least $20
million or fifty percent of their outstanding stock.  As of the
Petition Date, the only transaction which had been consummated
under the Goldman retention letter was the sale of BabyCenter LLC
for approximately $12 million.

After the bankruptcy cases were filed, MNAT became aware of
the dispute between the Debtors and Goldman.  On May 25, 2001,

21

MNAT wrote to Goldman on behalf of the Debtors requesting at least $2.5 million of the success fee be returned.  The matter was resolved by a Termination Agreement in August, 2001, pursuant to which Goldman returned approximately $2.55 million to the Debtors.  MNAT admits, however, that by early June, 2001, it was aware that the Debtors had substantial other claims against Goldman.  Rather than file a supplemental disclosure of its conflict, MNAT states that it "solved" the problem by involving the Committee in discussions with Goldman and ultimately arranging for the Committee to take over the representation of the estate in matters involving Goldman.

On September 26, 2001, the Debtors filed a motion to authorize the Committee to investigate and prosecute any further actions the estate may have against Goldman ("the Committee Authorization Motion").  In that Motion, MNAT disclosed that it represented Goldman in an unrelated matter.  When no objections were filed, the Court granted the Committee Authorization Motion by order dated October 12, 2001.

Thereafter, the Committee asserted preference and fraudulent conveyance claims against Goldman with respect to the remaining $500,000 of the success fee.  The parties have reached a settlement of that motion which would require Goldman to pay an additional $200,000 to the estate.  Alber objected to that

settlement asserting that it is tainted by conflicts of interest. The Court took the Goldman settlement motion under advisement with these matters.[4]

Alber argues that MNAT's representation of the Goldman Affiliates during the pendency of the Debtors' case, while at the same time it represented Goldman in the <u>Finova</u> case, created a conflict of interest which is impermissible under section 327(a) of the Bankruptcy Code. He argues that MNAT intentionally failed to disclose its representation of the Goldman Affiliates at the outset of the case and that the subsequent disclosure was inadequate.

### i.    <u>Disclosure</u>

MNAT argues that the disclosure requirements do not go so far as to require the disclosure of all connections it has with all parties in interest in the case. Such a rule would be so onerous as to create an impossible task, particularly in large corporate cases. <u>See, e.g.</u>, <u>In re Enron Corp.</u>, No. 01-16034, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), <u>aff'd</u>, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument that counsel should be disqualified for "a failure to disclose –

---

[4] As noted hereafter, the Committee (and now the PEDC) is also pursuing a suit in District Court in New York against Goldman related to the Debtors' initial public offering. That action is not affected by the settlement before this Court.

not connections as required under 2014 - but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough.").

While the disclosure requirements "may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict." In re BH & P, Inc., 119 B.R. 35, 44 (D.N.J. 1990), aff'd 949 F.2d 1300 (3d Cir. 1991). In this case, there was an actual conflict beginning in May 2001, when MNAT learned that the Debtors had a claim against Goldman. Disclosure at that time was mandated.

### ii. Conflict of interest

MNAT argues nonetheless that its representation of the Debtors was at all times consistent with the requirements of section 327(a) of the Bankruptcy Code because it did not hold any "adverse interest" with respect to the Debtors and remained "disinterested" during the engagement. This is incorrect. While MNAT did not hold an interest adverse to the estate, it represented one.

MNAT suggests, however, that Goldman did not really have an interest adverse to the Debtors because it was clear that the success fee had to be returned by Goldman.  That is belied by the fact that Goldman did not immediately return the funds and it took several months to obtain even the $2.5 million.  The final settlement of this dispute was filed in December 2004, more than three years later.  The suggestion that there was no real adverse interest between the Debtors and Goldman is quite simply wrong.  Therefore, instead of representing the Debtors in any matter involving Goldman, MNAT should have promptly filed a supplemental affidavit with the Court disclosing its connection with Goldman and let another, disinterested professional handle the matter.

MNAT contends that its representation of Goldman in the Finova case was not a conflict because it was unrelated to this case, was limited to acting as Delaware counsel, and only accounted for 0.24% of the firm's total billings from 2000 to 2004.  In support of its argument, MNAT cites In re Muma Servs., Inc., 286 B.R. 583, 591 (Bankr. D. Del. 2002).  In the Muma case, the Court held that the limited representation of a client in another bankruptcy case did not disqualify the firm from representing the committee in a suit against the former client.

The Muma case is distinguishable from the instant case. First, the Muma case dealt with committee counsel, not debtor's

25

counsel.[5]  Second, in <u>Muma</u>, committee counsel did not continue to represent the other client (in fact the responsible attorney left the firm saying he was taking the client).  Third, the Court found that the client had waived any conflict by not objecting to the firm's retention by the committee for more than a year.

In this case, MNAT continued to represent Goldman in the <u>Finova</u> case.  Further, Goldman did not waive any conflict as is evidenced by the fact that MNAT admitted in the Committee Authorization Motion that there was a conflict and that it was not able to represent the Debtors in any action against Goldman.

Because MNAT had an actual conflict of interest it was not qualified to represent the Debtors in asserting their claims against Goldman.  <u>See, e.g.</u>, <u>In re Fleming Cos.</u>, 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("[S]ection 327(a) imposes a per se disqualification on any professional who has an actual conflict of interest.") citing <u>In re Pillowtex, Inc.</u>, 304 F.3d 246, 251 (3d Cir. 2002).

---

[5]  Committee counsel, retained under section 1103, need only show it does not represent an interest adverse to the estate; in fact, committee counsel is specifically authorized to represent a creditor in the case so long as its interests are not adverse to the committee's.  11 U.S.C. § 1103(b).  In contrast, debtor's counsel, retained under section 327, must establish that it is disinterested, which is a higher standard.  11 U.S.C. § 101(14)(E).

iii. <u>Timing of Disclosure</u>

MNAT asserts that it could not have disclosed its
representation of the Goldman affiliates in the <u>Finova</u> case when
the retention application was filed because it did not know at
that time of Goldman's involvement in this case.

Assuming arguendo that MNAT did not know at the outset of
this case that Goldman was involved, it nonetheless became aware
of Goldman's involvement in May 2001, when MNAT learned that the
Debtors had the right to recover the success fee from Goldman.
At that time, MNAT was obligated to file a supplemental affidavit
of disinterestedness, disclosing its connection with Goldman.
<u>See, e.g.</u>, <u>Rome</u>, 19 F.3d at 59 ("as soon as counsel acquires even
constructive knowledge reasonably suggesting an actual or
potential conflict . . . a bankruptcy court ruling should be
obtained.").  It failed to do so.

MNAT asserts, however, that it did disclose the connection
with Goldman by filing the Committee Authorization Motion when
the firm learned of circumstances that necessitated the
additional disclosure.  The Court finds that is not sufficient.
The Committee Authorization Motion was filed four months <u>after</u>
MNAT knew there was a conflict, during which time MNAT continued
to represent the Debtors on the matter.  Further, the disclosures
should have been made in a supplemental declaration filed under

27

Bankruptcy Rule 2014(a). "It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources." B.E.S. Concrete, 93 B.R. at 236.

iv. <u>Harm to the estate</u>

MNAT contends nonetheless that no sanctions are warranted because there was no harm to the estate. MNAT was successful in collecting part of the success fee from Goldman and no release of any other claims was given to Goldman. MNAT also asserts that the Committee was kept informed of the issue and that, therefore, when the Committee had to take over the representation, there was no delay.

The Court rejects MNAT's arguments. Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest. See, e.g., Leslie Fay, 175 B.R. at 531 (holding that failure to disclose representation of parties who were materially adverse to the debtors mandated disallowance of fees awarded to counsel for debtors even though counsel "caused the debtors no actual injury, and represented them in an exemplary fashion.").

The Court notes, further, that MNAT's actions did result in harm to the estate because of the duplication of effort during the summer of 2001 caused by MNAT's continued work on the Goldman

matter while keeping the Committee advised at every turn.  If
MNAT had simply withdrawn, the Committee counsel alone would have
been billing the estate for this work.

v.   <u>Remedy</u>

Because the case is now over, disqualification of MNAT as
counsel to the Debtors is not practical.  Although the Court
could order disgorgement of all fees earned by MNAT after it
ceased being disinterested, the Court finds that is unwarranted
because MNAT did ultimately recuse itself from Goldman matters in
September, 2001.  Therefore, after that time it was not laboring
under a conflict of interest.  Because it had an actual conflict
for several months (which it failed to timely disclose), the
Court concludes that MNAT should disgorge all fees received in
this case for work done by it on matters involving Goldman.  11
U.S.C. §328(c) ("the court may deny allowance of compensation . .
. if, at any time during such professional person's employment
under section 327 . . . such professional person is not a
disinterested person, or represents or holds an interest adverse
to the interest of the estate with respect to the matter on which
such professional person is employed.").  <u>See also</u>, <u>In re Granite
Partners, L.P.</u>, 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998)
(holding that court has discretion under section 328(c) to deny
fees to counsel where a conflict of interest is found); <u>B.E.S.</u>

29