<u>Concrete</u>, 93 B.R. at 237 (holding that court has discretion to deny fees for failure to disclose).

> b. <u>GECC</u>

With respect to GECC, MNAT admits that it did not disclose the connection. It asserts, however, that it failed to disclose the relationship because it was not aware that GECC was a creditor. GECC was not listed as a creditor on the Debtors' schedules or matrix because it apparently had received an assignment of another creditor's position. Therefore, MNAT asserts that it had no reason to disclose any connection at the time it filed its retention application.

MNAT did, however, become aware of GECC's involvement when GECC filed a notice of appearance in the case on June 4, 2001, and a motion to compel the assumption or rejection of its lease with the Debtors on June 20, 2001. Notwithstanding that notice, MNAT admits that it did not file any additional disclosure.

Instead, MNAT continued to represent the Debtors in connection with matters involving GECC. Those matters apparently included discussions with GECC which resulted in its withdrawal of the motion to compel and the Debtors' agreement to surrender the equipment to GECC. MNAT also represented the Debtors in connection with GECC's administrative claim of $72,909.87. The Debtors, represented by MNAT, objected to that claim, which was

ultimately settled for $57,767.89. At no time did MNAT disclose
(to the Court, creditors and perhaps even the Debtors) its
concurrent representation of GECC in the <u>Finova</u> case.

Because MNAT was representing GECC in another case at the
same time, its representation of the Debtors against GECC in this
case constituted an actual conflict of interest, in the absence
of a conflict waiver executed by the parties after full
disclosure. <u>See, e.g.</u>, <u>B.E.S. Concrete</u>, 93 B.R. at 235
("Although the parties can waive the conflict upon appropriate
disclosures, the waiver is more difficult to obtain in a chapter
11 case because the debtor in possession stands in a fiduciary
capacity that constrains its ability to make such a waiver.")

MNAT asserts that its failure to conduct an additional
conflicts search and to make a supplemental disclosure of the
GECC relationship was "an inadvertent oversight." That does not
excuse the failure. <u>See, e.g.</u>, <u>BH & P</u>, 949 F.2d at 1318 (finding
that failure to disclose may result in disallowance of fees or
disqualification, even if the failure was negligent and not
willful); <u>In re Jore Corp.</u>, 298 B.R. 703, 729 (Bankr. D. Mont.
2003) (same).

Because there was an actual conflict and no disclosure was
made, the Court will require MNAT to disgorge the fees the firm
has received for work done on behalf of the Debtors in the

31

matters involving GECC.  See, e.g., In re Kaiser Group Int'l,

Inc., 272 B.R. 846, 850 (Bankr. D. Del. 2002) (concluding that

court has inherent power to supervise attorneys who appear before

it).

    C.   Traub, Bonaquist, Fox LLP

        1.   Alber Motion

Although his pleadings are replete with hyperbole[6] and

assertions that were revealed to be false when tested at trial,[7]

the crux of Alber's Motion against TBF has some merit: it asserts

---

[6]  An example is Alber's joinder to the UST Motion for
disgorgement of fees by TBF:

    44.   While I, ALBER, sympathize with the far reaching
           implications to the system (and cases as a whole
           throughout) of the blatant scheming that I, ALBER, feel
           is overwhelming proved positive by the blatant
           audacious disregard for the system as a whole such as
           the language of the hiring letter, by the vastly
           experienced attorney professionals of the TB&F, MNAT
           members in bankruptcy as legal extensive experienced
           professionals having filed many disclosure, fee
           applications, oaths etc. where even TB&F, ADA disclosed
           their relationship by the ADA letter in the Homelife
           case which ran basically almost concurrent with the
           eToys ESTATE and TB&F complied in part with 11 U.S.C. §
           327 and Rule 2014 in Homelife and certainly was
           preconfirmation to the eToys PLAN of 2002, along with
           the admittance on March 1, 2005 of the payments by TB&F
           to GOLD in 2001, along with the subsequent admittance
           that reimbursement of the $120,000 was paid by ADA back
           to TB&F, creating a triangle of affiliations, along
           with TB&F admittance that it made a conscious decision
           not to disclose even after the issue came to public
           light in the Bonus Sales [sic] case. . . .

[7]  See Discussion at Part E, infra.

that there is reason to disqualify TBF as counsel to the PEDC and
to require disgorgement of all fees earned while TBF was counsel
to the Committee because of TBF's failure at any time to disclose
its relationship with Gold.

        The relationship between Gold and TBF extends over many
years and involves several bankruptcy cases where they were
retained by the same or adverse parties.  Alber refers to that
relationship as "incestuous."  The Court, however, differs.  It
is not unusual for professionals and turnaround specialists to
work on the same cases.  In fact, given the specialized nature of
the bankruptcy practice, it is inevitable.

        There is, however, one aspect of the parties' relationship
that is unusual.  In late 2000 or early 2001, Paul Traub, a
partner in TBF, discussed with Gold the possibility of a joint
venture for marketing inventory control and asset disposition
services to distressed companies.  Traub and Gold formed a
limited liability corporation called ADA; Gold and Traub are the
sole, and equal, members in ADA.  Although ADA was not
incorporated until April 26, 2001, Gold was compensated by ADA at
the rate of $30,000 per month beginning in February 2001.
Because ADA had not been formed and had no assets at that time,
the compensation was actually paid by TBF.  Gold and Traub
testified that the funds were lent by TBF to ADA and were

ultimately repaid by ADA from revenues ADA earned.

Despite being members of ADA, Gold and Traub are not required to work full time for ADA and may (and do) obtain work individually. Any work done by Gold and Traub individually is not required to be shared with the other or with ADA. ADA has no offices of its own, but conducts its business from the offices of TBF. Traub testified that ADA maintains its own books and records, separate from TBF. TBF does provide administrative services for ADA which ADA reimburses, from time to time. ADA has also used TBF personnel as non-legal consultants on its cases and has paid TBF, from time to time, for those services.

In addition to the ADA relationship, in early 2001 TBF retained Gold as a consultant in connection with the OfficeMax, Inc., and Drug Emporium, Inc., cases. It is unclear when that relationship ended.

At the same time that ADA was being formed, TBF was retained (in January, 2001) by an informal committee of creditors of the Debtors. When the Debtors ultimately filed their chapter 11 petitions, TBF was retained by the Committee. Shortly thereafter, it became clear that the Debtors' senior management would not remain with the companies beyond May, 2001. The Debtors considered candidates for a restructuring executive from the Committee's and the Debtors' financial advisors. TBF, at the

suggestion of Traub, recommended Gold for the position.  After
conducting interviews, the Debtors hired Gold on June 11, 2001,
as wind-down coordinator and, after obtaining insurance, as their
president and chief executive officer.

In addition, Alber asserts that TBF has failed to disclose
its relationship with Fleet Retail Finance, an affiliate of
FleetBoston.  That failure to disclose is significant, Alber
asserts, because the PEDC is pursuing litigation against Goldman
and FleetBoston Financial arising from the Debtors' initial
public offering.  TBF was one of the firms representing the PEDC
in that case.[8]

At no time did Gold or TBF reveal any of these
relationships.  Alber asserts that TBF's failure to disclose
these relationships violates the disclosure requirements of Rule
2014 and constitutes a conflict of interest warranting
disgorgement of all fees earned in the case.  He also asserts
that the failure to disclose constitutes perjury and obstruction
of justice mandating a referral of this case to the U.S.
Attorney.

### a.   Failure to Disclose

TBF admits that it did not disclose the relationship with

--------------------------------

[8]  As a result of the Alber Motion, TBF has withdrawn as counsel
in the IPO litigation and the PEDC is represented by others in
that suit.

ADA.  At the time of their retention, TBF notes that there was no connection with ADA to be disclosed.  Further, even after the Debtor hired Gold, TBF asserts that no disclosure was mandated, because TBF has no relationship with ADA and ADA is not involved in this case.  ADA is an entity in which Traub, not TBF, has an interest.  TBF asserts it is not a member of and never obtained any income from ADA.  Further, the Debtors retained Gold, not ADA.  Therefore, TBF asserts the "connection" between this case and ADA is remote.

TBF did have a direct relationship with Gold, however, having hired him as a consultant on several of its cases.  TBF does admit, in hindsight, that it should have disclosed its relationship with Gold when the potential employment of Gold by the Debtors arose.  It contends that its failure to do so was a mistake and not intentional wrongdoing.  It argues that if it had intended to keep its relationship secret, it would not have disclosed it in the many cases in which ADA and TBF were involved.  See, e.g., Bonus Stores, No. 03-12284; In re Homelife Corp., No. 01-2412.

The duty of professionals to disclose is an ongoing one. Fed. R. Bankr. P. 2014(a); L. R. 2014-1(a).  The Court and parties in interest rely on the duty to disclose to help them monitor potential and actual conflicts.  Thus, the duty to

disclose is broader than the disclosure of actual conflicts, it
mandates the disclosure of all connections a professional may
have with the other parties in the case.

> All facts that may have any bearing on the
> disinterestedness of a professional must be disclosed.
> Consistent with the duty placed on the professional, it
> is the responsibility of the professional, not of the
> court, to make sure that all relevant connections have
> been brought to light. . . . So important is the duty
> of disclosure that the failure to disclose relevant
> connections is an independent basis for the
> disallowance of fees or even disqualification.

Leslie Fay, 175 B.R. at 533.  See also, BH & P, 949 F.2d at 1317–
18 (noting that professional may not leave court to search the
record for undisclosed relationships); Jore, 298 B.R. at 725–26
(holding that professional must disclose all connections; he may
not pick and choose which to disclose and which to ignore as
unimportant).

Failure to disclose may result in disallowance of fees or
disqualification, even if the failure was negligent and not
willful.  See, e.g., BH & P, 949 F.2d at 1318; Jore, 298 B.R. at
729.  Where the failure to disclose is willful, disallowance of
fees is almost assured.  In re Crivello, 134 F.3d 831, 836–37
(7th Cir. 1998) (stating that "a bankruptcy court should punish a
willful failure to disclose the connections required by Fed. R.
Bankr. P. 2014 as severely as an attempt to put forth a fraud on
the court.").  Accord In re ACandS, Inc., 297 B.R. 395, 405

(Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and ordering disgorgement of all fees of professional which willfully concealed relationships and potential and actual conflicts).

b.    Disqualification

TBF asserts that there is no basis under the Code for its disqualification as counsel to the Committee on the facts of this case.  It notes preliminarily that section 327(a) is not applicable because it was counsel to the Committee not counsel to the Debtors.  11 U.S.C. § 327(a).  Instead, it asserts that the proper standard for retention of counsel for a committee is section 1103 which provides:

> An attorney . . . employed to represent a committee
> under section 1102 of this title may not, while
> employed by such committee, represent any other entity
> having an adverse interest in connection with the case.
> Representation of one or more creditors of the same
> class as represented by the committee shall not per se
> constitute the representation of an adverse interest.

11 U.S.C. § 1103(b).  This provision is different from section 327(a) because (unlike counsel for the debtor) it does not require that counsel to a committee be disinterested.

Section 1103(b) does, however, require that counsel for the committee not hold or represent an adverse interest in connection with the case.  An adverse interest is "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which

38

the estate is a rival claimant." <u>TWI Int'l</u>, 162 B.R. at 675;
<u>National Liquidators</u>, 182 B.R. at 192.

TBF asserts that there is no evidence of any actual or
potential conflict between its representation of the Committee
and the Debtors' hiring of Gold.  It argues that Gold's
employment by the Debtors was completely unrelated to his work
for ADA (or TBF).  ADA had no involvement with this case, and,
even if it did, TBF had no interest in ADA.  No one at TBF, other
than Traub, had an interest in ADA.  While the relationships may
raise an appearance of a conflict, they are not actual conflicts
and disqualification is not warranted.  <u>See, e.g.</u>, <u>In re Marvel
Entm't Group Inc.</u>, 140 F.3d 463, 476 (3d Cir. 1998) (holding that
disqualification cannot be premised on the mere appearance of
conflict alone though court has discretion to disqualify counsel
with a potential conflict and must disqualify counsel with an
actual conflict).

### 2.   <u>UST Motion and Settlement</u>

The UST Disgorgement Motion was based, like Alber's, on
TBF's failure to disclose the relationship TBF and Traub had with
Gold.  Even if, as TBF asserts, the relationship did not
constitute a conflict or adverse interest, the UST asserted that
it had to be disclosed.  <u>Cf.</u>, <u>In re CF Holding Corp.</u>, 164 B.R.
799, 806-07 (Bankr. D. Conn. 1994) (holding that debtor's counsel

should be sanctioned, by a reduction in fees awarded, for failure
to disclose another professional's conflict of interest).

Shortly after filing the Disgorgement Motion, the UST
settled that dispute.  Under the settlement, TBF agreed to
disgorge $750,000 of the fees received by it in this case.  That
amount represents approximately 50% of the total post-petition,
pre-confirmation fees earned by TBF.

Settlements are favored as a means of minimizing litigation,
expediting administration of estates, and providing for the
efficient resolution of bankruptcy cases.  In re Martin, 91 F.3d
389, 393 (3d Cir. 1996).  To approve a settlement, the Court must
consider four criteria: "(1) the probability of success in
litigation; (2) the likely difficulties in collection; (3) the
complexity of the litigation involved, and the expense,
inconvenience and delay necessarily attending it; and (4) the
paramount interest of the creditors."  Id.  Because the
Disgorgement Motion is a sanctions motion, the Court should also
consider the deterrent value that approval of the Settlement
would have.  Pearson, 200 F.3d at 42 & n.7, quoting John's
Insulation, Inc. v. L. Addison & Assoc., Inc., 156 F.3d 101, 110
(1st Cir. 1998) ("The purpose of sanctions, moreover, is not
merely to penalize violations of court procedures, but also to
deter future violations by other parties, and thus sanctions do

40

not have to be strictly proportional to the severity of a given party's violations.").

Consideration of all these factors convinces the Court that approval of the Settlement is appropriate in this case. There is a strong probability that the UST will succeed in part on its Disgorgement Motion. TBF has admitted its failure to disclose its relationship with Gold. As discussed above, TBF vehemently disputes that the relationship with Gold ever constituted an actual conflict. Therefore, the Court concludes that there is a risk to both sides if this issue is litigated.

There is no suggestion that there will be any difficulty in collecting any judgment which the UST may obtain on its Disgorgement Motion. TBF is an established bankruptcy firm. It is aware that its failure to obey a court order of disgorgement in a bankruptcy case would have serious effects on its ability to practice in this Court or any other Bankruptcy Court in the future.

While the litigation is complex, the settlement will not save any expenses because Alber's Motion is virtually identical to the Disgorgement Motion. Discovery has been conducted and a full hearing has been held on Alber's Motion. Therefore, no savings are attendant to approval of the Settlement.

41

The paramount interests of creditors are served by approval of the Settlement, because the Court finds that it is a reasonable penalty for the transgression committed by TBF.

The Settlement also furthers the deterrent goal of a sanctions motion. The Court is convinced that the ordeal of defending the Alber Motion, coupled with the significant repayment of fees earned, will cause TBF to assiduously follow the disclosure requirements of the Code and Rules in the future. The settlement also serves as a "lighthouse" to others warning them to avoid the "rocks" of non-disclosure.

Consequently, the Court will grant the UST Motion for approval of the Settlement with TBF and will deny the Alber Motion to the extent it seeks to impose any additional penalty on TBF.

D.    <u>Barry Gold</u>

Alber also alleges that Gold should be disqualified and ordered to disgorge all fees received in this case because of his undisclosed relationship with TBF, ADA and Traub. Alber asserts that Gold: (1) had numerous conflicts of interest; (2) breached his duty of loyalty to the Debtors; (3) violated section 327(a) and Bankruptcy Rule 2014; (4) committed perjury and other bankruptcy crimes; and (5) wasted estate assets. Gold denies all of the allegations.

1.   <u>Conflicts of Interest</u>

Alber alleges that Gold had numerous conflicts of interest which should have prevented him from serving as the Debtors' CEO and president.  Alber asserts that the relationships among TBF, Traub, Gold and ADA constituted an actual conflict of interest that had to be disclosed and would have disqualified Gold from being retained by the Debtors.

Gold acknowledged that he has a relationship with counsel for the Committee but denies that it was a disabling conflict of interest.  Gold argues specifically that his relationships with ADA, TBF and Traub did not create a conflict of interest.  He was hired by the Debtors in this case, ADA was not.  Therefore, Gold asserts that there was no conflict to be disclosed.

Gold seeks to distinguish this case from the <u>Coram</u> case.  <u>In re Coram Healthcare Corp.</u>, 271 B.R. 228, 236 (Bankr. D. Del. 2001).  In <u>Coram</u>, the debtor's CEO had a written consulting agreement with one of the largest creditors by which he was paid $1 million in consulting fees.  Though the CEO insisted that the relationship was unrelated to the bankruptcy case, there was little evidence of what the CEO did to earn the fee, other than his work for the debtor.  Further, there was significant evidence that the CEO caused the debtor to take actions favorable to the

43

creditor that were not in the best interest of the debtor.[9]

The Court agrees that this case is distinguishable from the Coram case. The business relationship between Gold and Traub involved the split of profits from ADA. ADA earned its fees from work performed by Gold and/or Traub when it was retained in bankruptcy cases. Therefore, unlike the contract in Coram, Gold was not receiving compensation from Traub simply for "consulting" with him or otherwise doing his bidding. Gold earned compensation from ADA for work performed by ADA.

Further, Gold's business relationship is with a professional in the case, not with a creditor. ADA and Traub have no direct claim against the Debtors in this case and, therefore, there is less possibility that they will pressure Gold to promote their personal interests over the interests of other creditors in the case. In addition, TBF is acting as counsel for the Committee and has a fiduciary duty to all creditors. This is significantly different from acting as counsel for one individual creditor or group of creditors.

Furthermore, the instant case is a liquidation case where the interest of the Debtors and the creditors is the same: to

---

[9]  An example is the payment of interest in cash to the noteholders immediately before the bankruptcy filing when the debtor was contractually required only to pay in kind by the issuance of new notes.

realize the maximum recovery from the Debtors' assets.  In

contrast, <u>Coram</u> was a reorganization case where the creditors and

shareholders disagreed over the enterprise value and, therefore,

what recovery shareholders should receive.

The parties did, however, acknowledge that Gold was working

as a consultant to TBF on two cases at the time he was hired by

the Debtors.  That relationship, together with the fact that Gold

was being paid $30,000 per month by TBF (albeit on behalf of

ADA), does create at a minimum a potential conflict of interest.

Given Gold's extensive business relationship with TBF, his

loyalty to the Debtors could be questioned.

### 2.  <u>Breach of Loyalty</u>

Alber asserts that Gold's relationship with Traub (and

failure to disclose that relationship) constituted a breach of

Gold's duty of loyalty to the Debtors.  Gold denies that he had

any disqualifying conflict of interest which he was required to

disclose.

Under Delaware law "[c]orporate officers and directors are

not permitted to use their position of trust and confidence to

further their private interests. . . . and stand in a fiduciary

relation to the corporation and its stockholders." <u>Guth v. Loft,</u>

<u>Inc.,</u> 5 A.2d 503, 510 (Del. 1939).  The duty of loyalty "requires

an undivided and unselfish loyalty to the corporation [and]

demands that there shall be no conflict between duty and self-interest." Id.

In the instant case, there was a potential conflict between Gold's position as president and CEO of the Debtors and his business relationships with counsel for the Committee. "When faced with such divided loyalties, directors [and officers] have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts." Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989). The duty of loyalty is usually tested in cases where an officer or director has an interest in a party involved in a sale transaction with his company. In that context, courts focus on "fair dealing and fair price" in determining the entire fairness of the transaction. Id.

In this case, there was no transaction between the Debtors and ADA. Therefore, the Court need not determine if the dealings between the two were fair and for a fair price. Gold's position as a partner at ADA did not constitute a breach of his duty of loyalty to the Debtors under Delaware law. Nor is there any other evidence that Gold's other relationships with TBF and Traub caused him to violate his duty of loyalty to the Debtors. Consequently, the Court concludes that no breach has been established.

3.    <u>Section 327 and Bankruptcy Rule 2014</u>

Alber asserts that, because of his conflict of interest, Gold also violated section 327 and Bankruptcy Rule 2014 by failing to disclose his relationships with TBF, Traub and ADA at the time he was hired by the Debtors.

Gold argues that he is not required to comply with section 327(a) or Bankruptcy Rule 2014 because he was hired as an employee of the Debtor and is not a professional as that term is used in section 327(a).  <u>See, e.g.</u>, <u>In re All Seasons Indus., Inc.</u>, 121 B.R. 822, 825 (Bankr. N.D. Ind. 1990) (concluding that section 327(a) could not apply to officers, because it would result in wholesale removal of all pre-petition officers who are insiders and not disinterested); <u>In re Phoenix Steel Corp.</u>, 110 B.R. 141, 142 (Bankr. D. Del. 1989) (holding that officers employed by debtor pre-petition could continue to be employed post-petition under section 327(b) without court approval); <u>In re Midland Capital Corp.</u>, 82 B.R. 233, 239 n.10 (Bankr. S.D.N.Y. 1989) ("Executive officers are simply not 'professional persons'.").  <u>See generally</u>, <u>Collier on Bankruptcy</u> § 327.02[6][c] (15th ed. rev.) (stating that the correct analysis is that executives of the debtor are not professionals whose employment is subject to approval under section 327(a)).

47

Alber asserts, however, that Gold should have known that his relationship with ADA and Traub was inappropriate and should be disclosed because of his experience in the Bonus Stores case. That case, however, is distinguishable.

In Bonus Stores, the Debtor sought to retain both TBF and ADA (not Gold) as professionals under section 327(a). The Court denied the ADA application and permitted retention of TBF as special counsel only. That denial was not predicated on the relationship among TBF, Traub, Gold and ADA.[10]  Instead, it was because ADA and TBF had performed pre-petition services for the debtor's secured creditor in connection with the debtor. The Court found that their representation of a creditor in matters relating to the debtor was a direct conflict of interest precluding their retention by the debtor under section 327(a).

In this case, ADA was not retained by the Debtors; Gold was. In addition, there is no evidence in this case that Gold ever represented any creditor of the Debtors in dealings with the Debtors. Thus, the facts of this case are distinguishable from Bonus Stores.

There are courts, however, which have held that the retention and/or the compensation of the debtor's executives must

---

[10]  There could have been an issue of improper fee-sharing in that case had both ADA and TBF been retained. See 11 U.S.C. § 504(a). Because ADA was not retained, the issue was moot.

48

be approved by the bankruptcy court.  See, e.g., In re The Crouse
Group, Inc., 75 B.R. 553 (Bankr. E.D. Pa. 1987) (holding that,
although compensation of debtor's officers is subject to court
scrutiny, disqualification under section 327 is not automatic
because of lack of disinterestedness); In re Zerodec Mega Corp.,
39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (holding that employment
of officers and their compensation are subject to bankruptcy
court approval because "the statutory framework established by §§
327 and 328 provides an express treatment of the subject of
employment [of officers] with the requisite safeguards and
restrictions.") and cases cited therein.  See generally, 5
Collier on Bankruptcy § 1107.03 (15th ed. 1983) (stating that
section 1107 permits employment of officers under section 327(a)
even though they had been employed by the debtor pre-petition).

     Even the courts which hold that section 327(a) does not
apply conclude that they have authority to review the
compensation paid to officers for reasonableness.  See, e.g.,
Phoenix Steel, 110 B.R. at 142-43 (holding that compensation of
debtor's officers is subject to section 330 review by court);
Midland Capital, 82 B.R. at 238 (concluding that compensation of
officers is subject to review for reasonableness under section
503(b)(1)(A)).

The Court agrees with those courts that conclude that an officer is not a professional who needs to be retained by the debtor under section 327(a).  Nonetheless, the Court does have the power to supervise and deny compensation to officers of a debtor in appropriate circumstances.  The extent of relationships that might affect an officer's loyalty (and the failure to disclose those relationships) are factors that the Court should consider in supervising officers of the debtor.  In order to properly exercise such a role, as well as to permit other parties in interest to evaluate the officer, the disclosure of relationships that an officer may have with creditors, professionals, and other parties in interest in the case is necessary.  If officers do not have to disclose conflicts of interest, the Court would not be able to evaluate the reasonableness of the compensation being paid to the officer or prevent improper conduct.  The facts of this case, as well as others, convince the Court that without a disclosure requirement much mischief can occur.  <u>Coram</u>, 271 B.R. at 236.

In this case, Gold acknowledges that he failed to disclose to the Debtors, their counsel or any other party his relationship with TBF, Traub and ADA at the time he was hired by the Debtors. Unlike TBF and MNAT, as an officer of the Debtors Gold was not required at the time to disclose that relationship.  In the

future, however, the failure of an officer of a debtor to
disclose such relationships will subject that officer to review
and possible disgorgement of compensation if the Court concludes
that the relationship constitutes an actual conflict of interest.

In this case, the Court concludes, upon review of the
relationships among Gold, TBF, Traub and ADA, that the evidence
fails to establish any actual conflict of interest held by Gold
that caused any harm to the estate. Therefore, the Court
concludes that there is no basis to reduce Gold's compensation or
otherwise sanction him under the general equitable concepts of
the Bankruptcy Code.

### 4.    Perjury and Bankruptcy Crimes

Alber asserts that Gold committed perjury and other
bankruptcy crimes. Among the other "crimes" Alber asserts Gold
committed are obstruction of justice, bankruptcy fraud,
concealment of assets, false oaths and claims, and bribery.
Absolutely no evidence of any of these purported crimes was,
however, adduced at trial.

The essence of Alber's allegations is that Gold failed to
disclose his relationship with ADA, Traub, and TBF in his
retention application and in the biography he submitted in
connection with his retention as Plan Administrator. As noted
above, no rule existed at that time requiring an officer of the

debtor to disclose any relationship in a case.  Therefore, the
failure to disclose cannot be considered perjury or any other
bankruptcy crime.  Consequently, the Court finds no reason to
refer this matter to the U.S. Attorney.

### 5.    Waste of Estate Assets

Alber asserts that Gold wasted assets of the estate by
preparing a form 10k which the Debtors never filed with the SEC.
Gold testified that work was done on the 10k because the SEC
denied the Debtors' request for exemption.  Ultimately, however,
the 10k was never filed because it was determined after
consultation with counsel that the SEC filing requirements could
be satisfied by filing the Debtors' monthly operating reports
under an 8k rather than finishing the costly task of filing the
10k.  Gold testified that the work on the 10k was used in other
filings and was not a waste.

The Court does not fault Gold for having taken the
precaution of doing preliminary work on the 10k until it could be
clarified whether the filing would be required.  Further, Gold
was on salary so there was no additional expenditure by the
estate for that work.  Nor is there any suggestion that Gold
failed to perform other necessary tasks because of it.  In fact,
Gold points to the efforts he has expended in this case which has
resulted in a 16% recovery for general unsecured creditors, when

it was originally estimated that they would receive only 10%.
Gold asserts that his efforts in maximizing value for creditors
belies any suggestion that he was conflicted, failed to fulfill
his fiduciary duties, or wasted assets of the estate.  The Court
agrees that Alber has failed to establish any basis for his
allegation that estate assets have been wasted.

     Alber does raise, in his post-trial submission,[11] that Gold
has failed to adequately represent the interests of the estate by
allowing the Debtors' corporate registration to lapse in May
2002.  This was apparently occasioned by the resignation of the
Debtors' agent, without notice to the Debtors.

     Even if this occurred through negligence of the Debtors or
Gold, however, the Court concludes that there has been no harm to
the estate.  The Debtors in this case are liquidating.  Under
Delaware law, a dissolved company "remains a viable entity
authorized to possess property as well as sue and be sued
incident to the winding up of its affairs."  City Investing Co.
Liquidating Trust v. Continental Cas. Co., 624 A.2d 1191, 1195
(Del. 1993).  See also Del. Code Ann. tit. 8, § 278 (2004)
(providing an automatic three year extension of corporate
existence after dissolution, which may be extended for any

_____

[11]  This is one example of pleadings filed by Alber alleging
wrongdoing without presenting any evidence of it at the hearing.
The Court has entered Orders striking similar submissions.

purpose relating to litigation and the winding up of its
affairs).  Consequently, even if the Debtors had been dissolved
under Delaware law they are authorized to continue to perform all
things necessary to finish liquidating the estate and paying
creditors.  Thus, there is no basis to conclude that Gold has not
performed appropriately in this case.

     For the reasons stated above, the Court concludes that Gold
had a potential conflict of interest that should have been
disclosed at the time of his retention.  Because there is no
evidence that an actual conflict of interest arose or that any
harm occurred as a result of the potential conflict of interest,
the Court concludes that no reduction in Gold's compensation is
warranted.   The Court further does not find that Gold committed
any bankruptcy crime or wasted assets of the estate.  Therefore,
it will deny Alber's Motion as to Gold.

     E.    Goldman Settlement

     As noted above, the Committee has reached a settlement with
Goldman by which Goldman will remit an additional $200,000 to
settle the request for return of the success fee and expenses
paid pre-petition.  Alber objects to the settlement asserting (1)
that a member of the Committee had an actual conflict of interest
at the time the Goldman settlement was approved and (2) that the
estate has other claims against Goldman.

Despite Alber's allegations, the evidence presented at trial established that there was no conflict on interest.  Alber asserted that one of the members of the Committee (and later the PEDC), R.R. Donnelly & Sons Co. ("Donnelly"), had two Goldman directors on its board of directors at the time the Committee approved the Goldman settlement.  In fact, the affiliation was with GS Capital Partners, an entity which has no relationship or connection with Goldman.  Further, Donnelly was not even a member of the PEDC at the time the Goldman settlement was approved. Donnelly left the Committee, not because of any conflict, but because the individuals serving on the PEDC for Donnelly left its employ.

Further, the Settlement with Goldman does not contain a general release.  Therefore, approval of it will have no adverse effect on the action brought by the PEDC against Goldman and others for damages resulting from the failed IPO.

There being no other objections and the Court being convinced that the Goldman settlement is in the best interest of the estate, it will approve the Goldman settlement.


IV.  CONCLUSION

For the reasons stated above, the Court will grant, in part, Alber's Motion to disqualify and for disgorgement of fees from

MNAT and require the repayment of all fees earned for services rendered in connection with the Goldman and GECC matters.  The Court will grant the UST's Motion for approval of the Settlement with TBF and will deny Alber's Motion for sanctions against TBF to the extent it seeks any further relief from TBF.  The Court will deny Alber's motion for sanctions and other relief against Gold.  Finally, the Court will approve the Goldman settlement.

An appropriate Order is attached.

BY THE COURT:

Dated: October 4, 2005

Mary F. Walrath
United States Bankruptcy Judge