1104 of the Bankruptcy Code, which provides the authority for such an appointment, states:

> (a) At any time after commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>> (1) for cause . . .; or
>> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. . . .
> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner. . . if –
>> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104 (emphasis added). Because the Debtors' Plan has been confirmed, the Respondents assert that Alber's request for appointment of a trustee or examiner must be denied. The Court agrees that such a remedy is unavailable based on the express language of the Code.

### 4. Appointment of Equity Committee and Counsel

Alber also seeks the appointment of an equity committee and counsel to permit him to continue to investigate this case. The Court concludes that such a request is not warranted. Though

section 1102(a)(2) authorizes the Court to order the appointment of additional committees of creditors or equity security holders, it may do so only "if necessary to assure adequate representation" of those parties.  In this case there is no necessity to appoint a committee for equity security holders because their interests have been extinguished by the Debtors' Plan and they will receive nothing from the estate.  (See Plan at §§ 4.10.2 & 7.1(b).)  See, e.g., In re Kalvar Microfilm, Inc., 195 B.R. 599, 601 (Bankr. D. Del. 1996) (denying appointment of equity committee where request was made after plan and disclosure statement were filed).  Therefore, the Court will deny the request for appointment of an equity committee and counsel because it will provide no benefit to the estate and is simply too late.

            5.   Bad Faith

     The Respondents assert that the Motions were filed in bad faith.  Specifically, Gold asserts that the CLI Motion was filed in response to the Plan Administrator's objection to CLI's claim. Gold argues that CLI's Motion was filed to gain leverage in that contested matter.

     MNAT argues that Alber's request for relief is "a strategic ploy" to improve his position under the established liquidation scheme.  MNAT states that Alber has made it clear that he would

                                11

like the Debtors' shareholders to gain control of the Reorganized Debtor. MNAT notes further that Alber faxed the Motion to the firm within hours after he was served with the Reorganized Debtor's objection to Alber's Motions to disqualify TBF and Gold.

Even if the Motions were filed in bad faith, however, they raise serious questions about the disclosure of conflicts and connections made by both counsel for the Debtors and for the Committee in this chapter 11 case. Disclosure "goes to the heart of the integrity of the bankruptcy system." In re B.E.S. Concrete Prods., Inc., 93 B.R. 228, 236 (Bankr. E.D. Ca. 1988). Therefore, the Court is compelled to address the merits of the Motions.

### 6. Exculpations

The Respondents assert that the allegations regarding their activities prior to confirmation of the Debtors' Plan are barred by the exculpations they received under the Plan. The Plan provided releases to Gold, MNAT and TBF for "any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Plan Administrator or the Chapter 11 Cases . . . except for acts constituting willful misconduct or gross negligence." (See Plan at § 7.2(e).) This provision is consistent with Third Circuit authority. See, e.g., In re United Artists Theatre Co., 315 F.3d 217, 230 (3d Cir.

2003) (holding that indemnification provision in retention application of professional which excludes gross negligence and willful misconduct is consistent with professional's fiduciary duty to the estate under the Bankruptcy Code and Delaware law); In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000) (holding that release in plan of committee's professionals from liability for acts other than gross negligence or willful misconduct is consistent with the Bankruptcy Code).

The allegations in Alber's Motions are, however, that the parties had actual conflicts of interest which they knowingly failed to disclose at the time of their retention and throughout the case. If this is true, the Court concludes that the exculpation clause would not protect the Respondents because it constitutes willful misconduct. Therefore, the Court concludes that the releases do not preclude Alber from pressing his Motions.

### 7. Timeliness of Motions

MNAT asserts that, even absent a finding that Alber has brought the Motions in bad faith, Alber's right to obtain relief is time-barred under Rule 60(b). Rule 60(b) allows the Court to revoke or modify earlier orders and provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgement . . . [or] order. . . for the following reasons: (1) mistake,

inadvertence, surprise or excusable neglect; (2) newly
discovered evidence which by due diligence could not
have been discovered in time to move for a new trial
under Rule 59(b); (3) fraud . . . misrepresentation, or
other misconduct of an adverse party . . . or (6) any
other reason justifying relief from the operation of
the judgment.  The motion shall be made within a
reasonable time, and for reasons (1), (2), and (3) not
more than one year after the judgment . . . [or] order
. . . was entered or taken.

Fed. R. Civ. P. 60(b).

MNAT claims that sections (1), (2) or (3) are the only

conceivable bases under which Alber could seek relief, which

limits the time for bringing the motion to one year.  MNAT notes

that the Orders from which the Motions seek relief were all

entered more than one year ago.  Therefore, MNAT asserts that

relief is simply not available to Alber under Rule 60(b).

While MNAT is correct that Alber could have been entitled to

relief from the Orders under sections (1), (2) and (3) of Rule

60(b), Rule 60(b)(6) allows a court to reconsider an order for

"any other reason justifying relief from the operation of the

[order]."  Fed. R. Civ. P. 60(b)(6).  "To justify relief under

subsection (6), a party must either show some 'other reason'

justifying relief outside of the earlier clauses of the Rule, or,

if the reasons for seeking relief could have been considered in

an earlier motion under another subsection of the rule, [he] must

show 'extraordinary circumstances' suggesting the party is

faultless in the delay." In re Benjamin's-Arnolds, Inc., No. 4-90-6127, 1997 WL 86463, at *10 (Bankr. D. Minn. Feb 28, 1997).

Such "extraordinary circumstances" are present in this case. If the professionals did not disclose their conflicts or other connections with others in the case to the Court, or did so in ways that clearly contravened the statutory requirements, then parties did not have sufficient notice to seek relief under Rule 60(b)(1), (2) or (3) within the prescribed one-year time limit. In fact, many of the relationships were revealed only in response to Alber's Motion.

Furthermore, the disclosure obligation mandated by the Bankruptcy Code and Rules "implicates a public policy interest justifying relief . . . under Rule 60(b)(6)." In re Southmark Corp., 181 B.R. 291, 295 (Bankr. N.D. Tex. 1995) (granting relief under Rule 60(b)(6) from final fee order which had been entered nearly three years earlier). See also Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 244-45 (1944) (holding that fraud upon the court equitably tolls the time for seeking to set aside a judgment or order); Pearson v. First NH Mort. Corp., 200 F.3d 30, 35-41 (1st Cir. 1999) (holding that attorney's false disclosure which denied any connection with creditors could support a finding that attorney had committed a fraud on the court); Benjamin's-Arnold, 1997 WL 86463, at *10 (holding that

"the failure of an attorney employed by the estate to disclose a disqualifying conflict of interest, whether intentional or not, constitutes sufficient 'extraordinary circumstances' to justify relief under Rule 60(b)(6). To hold otherwise would only serve to penalize the [Plaintiff] for delay that was beyond his control and to reward conflicted attorneys for failing to disclose their conflicts beyond the one-year period.").

In this case it is alleged that the professionals did not disclose conflicts of interest that would have barred their retention. If this is true, it would constitute a fraud on the Court warranting relief even though more than a year has passed since the professionals were retained and their fees approved. Therefore, the Court concludes that Rule 60(b)(6) allows the Court to consider Alber's Motions.

B.    MNAT and its Partners

Alber seeks an order disqualifying MNAT from serving as counsel to the Debtors and disgorgement of all fees earned by MNAT and its partners who worked on the case. The basis of his Motion is that MNAT failed to disclose in its retention application that it had a conflict of interest because it was concurrently representing the Goldman Affiliates and GECC in the Finova case. GECC was a creditor in this case and the Debtors had claims against Goldman (including litigation that is

16

currently being prosecuted by the PEDC).

MNAT opposes the Motion arguing that: (1) it made "timely, adequate and candid" disclosures of its connections to the Goldman Affiliates in full compliance with the requirements of Bankruptcy Rule 2014; (2) the late supplemental disclosure of its connection to GECC was the result of "an inadvertent oversight"; and (3) its representation of the Debtors in the case was consistent with section 327(a) of the Code.

### 1.    Disinterestedness and Adverse Interests

Section 327(a) of the Bankruptcy Code governs a debtor's employment of attorneys in a bankruptcy case.  It provides, in relevant part:

> The [debtor], with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out [its] duties under this title.

11 U.S.C. § 327(a).

Thus, counsel for a debtor must not hold or represent an interest adverse to the estate.  An adverse interest is generally defined to mean "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." TWI Int'l v. Vanguard Oil Serv. Co., 162 B.R. 672, 675 (S.D.N.Y. 1987).  See also, In re National Liquidators, Inc.,

17

182 B.R. 186, 192 (S.D. Ohio 1995).

Further, under section 327 of the Code, counsel for the debtor must also be "disinterested." Disinterestedness is defined to mean that counsel "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." 11 U.S.C. § 101(14)(E). See also, TWI Int'l, 162 B.R. at 675.

### 2.   Disclosure Requirements

Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case. Rule 2014 requires that an application to retain counsel for the debtor:

> be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other parties in interest, [and] their respective attorneys and accountants.

Fed. R. Bankr. P. 2014(a).

Disclosure "goes to the heart of the integrity of the bankruptcy system." B.E.S. Concrete, 93 B.R. at 236. Therefore, the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an

18

attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate. See, e.g., In re Leslie Fay Cos., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). See generally 9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004). The bankruptcy court must be given timely and complete disclosure by the debtor's attorney of all connections with parties in interest in the case to "exercise its own ongoing affirmative responsibility 'to root out impermissible conflicts of interest' under Bankruptcy Code §§ 327(a) and 328(c)." Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994). See also, In re BH & P, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991).

Consequently, Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court all connections with parties in interest in the case, rather than furnishing only those which appear to implicate "disinterestedness" or "adverse interest" concerns under section 327(a). See, e.g., In re Filene's Basement, Inc., 239 B.R. 850, 856 (Bankr. D. Mass. 1999) (holding that the requirements of Bankruptcy Rule 2014 "transcend those of § 327(a), as they mandate disclosure of all connections with the [applicant] rather than being limited to those which deal with disinterestedness.").

19

Furthermore, the duty to disclose is ongoing.  Local Rule 2014-1 provides: "Promptly after learning any additional material information relating to [its] employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information."  Del. R. Bankr. P. 2014-1. See also, Rome, 19 F.3d at 57-58 ("[A]s the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals throughout their tenure, the need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.") (emphasis in original); In re Tinley Plaza Assocs., L.P., 142 B.R. 272, 278 (Bankr. N.D. Ill. 1992) ("[T]he duty to disclose continues beyond the initial stage of application to employ counsel. . . .  If a conflict arises after attorneys are employed by the debtor-in-possession, such conflict must be disclosed to the court and the court must immediately disqualify the attorney.") (citations omitted).

"So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees."  Leslie Fay, 175 B.R. at 533.  See also, Rome, 19 F.3d at 59 ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P.

2014(a), court-appointed counsel proceed <u>at</u> <u>their</u> <u>own</u> <u>risk</u>.")
(emphasis in original).

## a.    Goldman and its Affiliates

MNAT argues that it was not aware of Goldman's involvement
in this case at the time it filed its retention application
because Goldman was not a creditor.  In addition, because MNAT
had not represented the Debtors before the case was filed (and
was originally only to serve as local counsel), it was not aware
of the Debtors' pre-petition transactions with Goldman which led
to the conflict.

Prior to the bankruptcy filings, the Debtors had engaged
Goldman to obtain a sale, merger or capital infusion for their
ailing businesses.  Pursuant to an engagement letter, the Debtors
advanced Goldman $150,000 for out-of-pocket expenses and a $3
million success fee.  That letter provided, however, that $2.5
million of the success fee was refundable if Goldman did not
facilitate the sale of the Debtors' assets for at least $20
million or fifty percent of their outstanding stock.  As of the
Petition Date, the only transaction which had been consummated
under the Goldman retention letter was the sale of BabyCenter LLC
for approximately $12 million.

After the bankruptcy cases were filed, MNAT became aware of
the dispute between the Debtors and Goldman.  On May 25, 2001,

21

MNAT wrote to Goldman on behalf of the Debtors requesting at least $2.5 million of the success fee be returned. The matter was resolved by a Termination Agreement in August, 2001, pursuant to which Goldman returned approximately $2.55 million to the Debtors. MNAT admits, however, that by early June, 2001, it was aware that the Debtors had substantial other claims against Goldman. Rather than file a supplemental disclosure of its conflict, MNAT states that it "solved" the problem by involving the Committee in discussions with Goldman and ultimately arranging for the Committee to take over the representation of the estate in matters involving Goldman.

On September 26, 2001, the Debtors filed a motion to authorize the Committee to investigate and prosecute any further actions the estate may have against Goldman ("the Committee Authorization Motion"). In that Motion, MNAT disclosed that it represented Goldman in an unrelated matter. When no objections were filed, the Court granted the Committee Authorization Motion by order dated October 12, 2001.

Thereafter, the Committee asserted preference and fraudulent conveyance claims against Goldman with respect to the remaining $500,000 of the success fee. The parties have reached a settlement of that motion which would require Goldman to pay an additional $200,000 to the estate. Alber objected to that

22

settlement asserting that it is tainted by conflicts of interest.
The Court took the Goldman settlement motion under advisement
with these matters.[4]

Alber argues that MNAT's representation of the Goldman
Affiliates during the pendency of the Debtors' case, while at the
same time it represented Goldman in the Finova case, created a
conflict of interest which is impermissible under section 327(a)
of the Bankruptcy Code.  He argues that MNAT intentionally failed
to disclose its representation of the Goldman Affiliates at the
outset of the case and that the subsequent disclosure was
inadequate.

### i.    Disclosure

MNAT argues that the disclosure requirements do not go so
far as to require the disclosure of all connections it has with
all parties in interest in the case.  Such a rule would be so
onerous as to create an impossible task, particularly in large
corporate cases.  See, e.g., In re Enron Corp., No. 01-16034,
2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), aff'd,
2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument
that counsel should be disqualified for "a failure to disclose –

---

[4] As noted hereafter, the Committee (and now the PEDC) is also
pursuing a suit in District Court in New York against Goldman
related to the Debtors' initial public offering.  That action is
not affected by the settlement before this Court.

23

not connections as required under 2014 – but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough.").

While the disclosure requirements "may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict." In re BH & P, Inc., 119 B.R. 35, 44 (D.N.J. 1990), aff'd 949 F.2d 1300 (3d Cir. 1991). In this case, there was an actual conflict beginning in May 2001, when MNAT learned that the Debtors had a claim against Goldman. Disclosure at that time was mandated.

### ii. Conflict of interest

MNAT argues nonetheless that its representation of the Debtors was at all times consistent with the requirements of section 327(a) of the Bankruptcy Code because it did not hold any "adverse interest" with respect to the Debtors and remained "disinterested" during the engagement. This is incorrect. While MNAT did not hold an interest adverse to the estate, it represented one.

24

MNAT suggests, however, that Goldman did not really have an interest adverse to the Debtors because it was clear that the success fee had to be returned by Goldman. That is belied by the fact that Goldman did not immediately return the funds and it took several months to obtain even the $2.5 million. The final settlement of this dispute was filed in December 2004, more than three years later. The suggestion that there was no real adverse interest between the Debtors and Goldman is quite simply wrong. Therefore, instead of representing the Debtors in any matter involving Goldman, MNAT should have promptly filed a supplemental affidavit with the Court disclosing its connection with Goldman and let another, disinterested professional handle the matter.

MNAT contends that its representation of Goldman in the Finova case was not a conflict because it was unrelated to this case, was limited to acting as Delaware counsel, and only accounted for 0.24% of the firm's total billings from 2000 to 2004. In support of its argument, MNAT cites In re Muma Servs., Inc., 286 B.R. 583, 591 (Bankr. D. Del. 2002). In the Muma case, the Court held that the limited representation of a client in another bankruptcy case did not disqualify the firm from representing the committee in a suit against the former client.

The Muma case is distinguishable from the instant case. First, the Muma case dealt with committee counsel, not debtor's

25

counsel.[5]  Second, in <u>Muma</u>, committee counsel did not continue to represent the other client (in fact the responsible attorney left the firm saying he was taking the client).  Third, the Court found that the client had waived any conflict by not objecting to the firm's retention by the committee for more than a year.

In this case, MNAT continued to represent Goldman in the <u>Finova</u> case.  Further, Goldman did not waive any conflict as is evidenced by the fact that MNAT admitted in the Committee Authorization Motion that there was a conflict and that it was not able to represent the Debtors in any action against Goldman.

Because MNAT had an actual conflict of interest it was not qualified to represent the Debtors in asserting their claims against Goldman.  <u>See, e.g.</u>, <u>In re Fleming Cos.</u>, 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("[S]ection 327(a) imposes a per se disqualification on any professional who has an actual conflict of interest.") citing <u>In re Pillowtex, Inc.</u>, 304 F.3d 246, 251 (3d Cir. 2002).

---

[5]  Committee counsel, retained under section 1103, need only show it does not represent an interest adverse to the estate; in fact, committee counsel is specifically authorized to represent a creditor in the case so long as its interests are not adverse to the committee's.  11 U.S.C. § 1103(b).  In contrast, debtor's counsel, retained under section 327, must establish that it is disinterested, which is a higher standard.  11 U.S.C. § 101(14)(E).

iii.  Timing of Disclosure

MNAT asserts that it could not have disclosed its
representation of the Goldman affiliates in the Finova case when
the retention application was filed because it did not know at
that time of Goldman's involvement in this case.

Assuming arguendo that MNAT did not know at the outset of
this case that Goldman was involved, it nonetheless became aware
of Goldman's involvement in May 2001, when MNAT learned that the
Debtors had the right to recover the success fee from Goldman.
At that time, MNAT was obligated to file a supplemental affidavit
of disinterestedness, disclosing its connection with Goldman.
See, e.g., Rome, 19 F.3d at 59 ("as soon as counsel acquires even
constructive knowledge reasonably suggesting an actual or
potential conflict . . . a bankruptcy court ruling should be
obtained.").  It failed to do so.

MNAT asserts, however, that it did disclose the connection
with Goldman by filing the Committee Authorization Motion when
the firm learned of circumstances that necessitated the
additional disclosure.  The Court finds that is not sufficient.
The Committee Authorization Motion was filed four months after
MNAT knew there was a conflict, during which time MNAT continued
to represent the Debtors on the matter.  Further, the disclosures
should have been made in a supplemental declaration filed under

27

Bankruptcy Rule 2014(a). "It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources." B.E.S. Concrete, 93 B.R. at 236.

### iv. Harm to the estate

MNAT contends nonetheless that no sanctions are warranted because there was no harm to the estate. MNAT was successful in collecting part of the success fee from Goldman and no release of any other claims was given to Goldman. MNAT also asserts that the Committee was kept informed of the issue and that, therefore, when the Committee had to take over the representation, there was no delay.

The Court rejects MNAT's arguments. Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest. See, e.g., Leslie Fay, 175 B.R. at 531 (holding that failure to disclose representation of parties who were materially adverse to the debtors mandated disallowance of fees awarded to counsel for debtors even though counsel "caused the debtors no actual injury, and represented them in an exemplary fashion.").

The Court notes, further, that MNAT's actions did result in harm to the estate because of the duplication of effort during the summer of 2001 caused by MNAT's continued work on the Goldman

matter while keeping the Committee advised at every turn.  If
MNAT had simply withdrawn, the Committee counsel alone would have
been billing the estate for this work.

### v.  Remedy

Because the case is now over, disqualification of MNAT as
counsel to the Debtors is not practical.  Although the Court
could order disgorgement of all fees earned by MNAT after it
ceased being disinterested, the Court finds that is unwarranted
because MNAT did ultimately recuse itself from Goldman matters in
September, 2001.  Therefore, after that time it was not laboring
under a conflict of interest.  Because it had an actual conflict
for several months (which it failed to timely disclose), the
Court concludes that MNAT should disgorge all fees received in
this case for work done by it on matters involving Goldman.  11
U.S.C. §328(c) ("the court may deny allowance of compensation . .
. if, at any time during such professional person's employment
under section 327 . . . such professional person is not a
disinterested person, or represents or holds an interest adverse
to the interest of the estate with respect to the matter on which
such professional person is employed.").  See also, In re Granite
Partners, L.P., 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998)
(holding that court has discretion under section 328(c) to deny
fees to counsel where a conflict of interest is found); B.E.S.

Concrete, 93 B.R. at 237 (holding that court has discretion to deny fees for failure to disclose).

          b.    GECC

With respect to GECC, MNAT admits that it did not disclose the connection. It asserts, however, that it failed to disclose the relationship because it was not aware that GECC was a creditor. GECC was not listed as a creditor on the Debtors' schedules or matrix because it apparently had received an assignment of another creditor's position. Therefore, MNAT asserts that it had no reason to disclose any connection at the time it filed its retention application.

MNAT did, however, become aware of GECC's involvement when GECC filed a notice of appearance in the case on June 4, 2001, and a motion to compel the assumption or rejection of its lease with the Debtors on June 20, 2001. Notwithstanding that notice, MNAT admits that it did not file any additional disclosure.

Instead, MNAT continued to represent the Debtors in connection with matters involving GECC. Those matters apparently included discussions with GECC which resulted in its withdrawal of the motion to compel and the Debtors' agreement to surrender the equipment to GECC. MNAT also represented the Debtors in connection with GECC's administrative claim of $72,909.87. The Debtors, represented by MNAT, objected to that claim, which was

ultimately settled for $57,767.89.  At no time did MNAT disclose
(to the Court, creditors and perhaps even the Debtors) its
concurrent representation of GECC in the Finova case.

Because MNAT was representing GECC in another case at the
same time, its representation of the Debtors against GECC in this
case constituted an actual conflict of interest, in the absence
of a conflict waiver executed by the parties after full
disclosure.  See, e.g., B.E.S. Concrete, 93 B.R. at 235
("Although the parties can waive the conflict upon appropriate
disclosures, the waiver is more difficult to obtain in a chapter
11 case because the debtor in possession stands in a fiduciary
capacity that constrains its ability to make such a waiver.")

MNAT asserts that its failure to conduct an additional
conflicts search and to make a supplemental disclosure of the
GECC relationship was "an inadvertent oversight."  That does not
excuse the failure.  See, e.g., BH & P, 949 F.2d at 1318 (finding
that failure to disclose may result in disallowance of fees or
disqualification, even if the failure was negligent and not
willful); In re Jore Corp., 298 B.R. 703, 729 (Bankr. D. Mont.
2003) (same).

Because there was an actual conflict and no disclosure was
made, the Court will require MNAT to disgorge the fees the firm
has received for work done on behalf of the Debtors in the

matters involving GECC.  See, e.g., In re Kaiser Group Int'l,

Inc., 272 B.R. 846, 850 (Bankr. D. Del. 2002) (concluding that

court has inherent power to supervise attorneys who appear before

it).

    C.   Traub, Bonaquist, Fox LLP

        1.  Alber Motion

Although his pleadings are replete with hyperbole[6] and

assertions that were revealed to be false when tested at trial,[7]

the crux of Alber's Motion against TBF has some merit: it asserts

_____

[6]  An example is Alber's joinder to the UST Motion for
disgorgement of fees by TBF:

    44.   While I, ALBER, sympathize with the far reaching
        implications to the system (and cases as a whole
        throughout) of the blatant scheming that I, ALBER, feel
        is overwhelming proved positive by the blatant
        audacious disregard for the system as a whole such as
        the language of the hiring letter, by the vastly
        experienced attorney professionals of the TB&F, MNAT
        members in bankruptcy as legal extensive experienced
        professionals having filed many disclosure, fee
        applications, oaths etc. where even TB&F, ADA disclosed
        their relationship by the ADA letter in the Homelife
        case which ran basically almost concurrent with the
        eToys ESTATE and TB&F complied in part with 11 U.S.C. §
        327 and Rule 2014 in Homelife and certainly was
        preconfirmation to the eToys PLAN of 2002, along with
        the admittance on March 1, 2005 of the payments by TB&F
        to GOLD in 2001, along with the subsequent admittance
        that reimbursement of the $120,000 was paid by ADA back
        to TB&F, creating a triangle of affiliations, along
        with TB&F admittance that it made a conscious decision
        not to disclose even after the issue came to public
        light in the Bonus Sales [sic] case. . . .

[7] See Discussion at Part E, infra.

that there is reason to disqualify TBF as counsel to the PEDC and to require disgorgement of all fees earned while TBF was counsel to the Committee because of TBF's failure at any time to disclose its relationship with Gold.

The relationship between Gold and TBF extends over many years and involves several bankruptcy cases where they were retained by the same or adverse parties. Alber refers to that relationship as "incestuous." The Court, however, differs. It is not unusual for professionals and turnaround specialists to work on the same cases. In fact, given the specialized nature of the bankruptcy practice, it is inevitable.

There is, however, one aspect of the parties' relationship that is unusual. In late 2000 or early 2001, Paul Traub, a partner in TBF, discussed with Gold the possibility of a joint venture for marketing inventory control and asset disposition services to distressed companies. Traub and Gold formed a limited liability corporation called ADA; Gold and Traub are the sole, and equal, members in ADA. Although ADA was not incorporated until April 26, 2001, Gold was compensated by ADA at the rate of $30,000 per month beginning in February 2001. Because ADA had not been formed and had no assets at that time, the compensation was actually paid by TBF. Gold and Traub testified that the funds were lent by TBF to ADA and were

33

ultimately repaid by ADA from revenues ADA earned.

Despite being members of ADA, Gold and Traub are not required to work full time for ADA and may (and do) obtain work individually. Any work done by Gold and Traub individually is not required to be shared with the other or with ADA. ADA has no offices of its own, but conducts its business from the offices of TBF. Traub testified that ADA maintains its own books and records, separate from TBF. TBF does provide administrative services for ADA which ADA reimburses, from time to time. ADA has also used TBF personnel as non-legal consultants on its cases and has paid TBF, from time to time, for those services.

In addition to the ADA relationship, in early 2001 TBF retained Gold as a consultant in connection with the OfficeMax, Inc., and Drug Emporium, Inc., cases. It is unclear when that relationship ended.

At the same time that ADA was being formed, TBF was retained (in January, 2001) by an informal committee of creditors of the Debtors. When the Debtors ultimately filed their chapter 11 petitions, TBF was retained by the Committee. Shortly thereafter, it became clear that the Debtors' senior management would not remain with the companies beyond May, 2001. The Debtors considered candidates for a restructuring executive from the Committee's and the Debtors' financial advisors. TBF, at the

34